UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| IN RE: <br><br> BAKER MANUFACTURING COMPANY, INC., <br><br> DEBTOR.[1] | CASE NO. 18-81104 <br><br> CHAPTER 11 |

### DECLARATION OF CHARLES E. MARTIN IN SUPPORT OF FIRST DAY MOTIONS

I, Charles E. Martin, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Executive Officer and President of Baker Manufacturing Company, Inc., the debtor and debtor-in-possession (the "**Debtor**" or the "**Company**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

2. Before joining the Company, I held various positions, including: Chairman & CEO of Zephyr Associates, a software developer; Chairman and CEO of Third Party Solutions, Inc., a national pharmacy services company; Chief Investment Officer of Kemmons Wilson, Inc., a family office, and; various executive positions in commercial banking. My wife is Sharon Baker Martin, one of the Debtor's shareholders. Because of my extensive business experience, the Company's shareholders asked me to become the Company's Chief Executive Officer and President, and I assumed those positions in 2012.

3. On the date hereof (the "**Petition Date**"), the Debtor filed a petition with the United States Bankruptcy Court for the Western District of Louisiana, Alexandria Division (this "**Court**") under chapter 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is

---

[1] The last four digits of the Debtor's federal tax identification number is (9680). The Debtor's service address is 75 Pineville Street, Pineville, LA 71360.

{N3661262.4}  1

operating its business and managing its property as the debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case, and no committees have been appointed or designated.

4. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PART I.

## PRELIMINARY STATEMENT

5. By motion to be filed (the "**Sale Motion**"), the Debtor will seek approval of bidding procedures and, thereafter, approval of the sale to a successful bidder or bidders of all or substantially all of the Debtor's assets, free and clear of any and all liens, claims, and interests (the "**Sale Transaction**" or "**Sale**"). To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its business pending this Court's approval of the Sale Transaction, and to avoid immediate and irreparable harm, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "**First Day Motion**"). The First Day Motions seek relief intended to allow the Debtor to effectively transition into chapter 11 and minimize disruption of the Debtor's business operations, thereby preserving and maximizing the value of the Debtor's estate.

6. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable

the Debtor to operate in chapter 11 with minimal disruption or loss of business; (b) constitutes a critical element to achieving a successful result in this Chapter 11 Case and preserving the value of the Debtor's assets; and (c) best serves the interests of the Debtor's estate and creditors.

7. Part II of this Declaration describes the Debtor's business, its structure and the circumstances surrounding the commencement of this Chapter 11 Case.

8. Part III sets forth the relevant facts in support of each of the First Day Motions including procedural and substantive motions.

9. Part IV sets forth relevant facts regarding additional motions and applications filed by the Debtor on [or shortly after the Petition Date], to be scheduled for hearing after the First Day Hearings, including the Sale Motion.

## PART II.
## OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

**A. Description of the Debtor's Business and History**

10. The Debtor is recognized as a leading innovator and manufacturer of height adjustable work surfaces that both provide solutions for office workers of different physiques and improve worker productivity and well-being.

11. A Louisiana corporation, with its principle place of business located in Pineville, Louisiana, the Company was originally organized by the late Jim Baker in 1958. The Company became one of the largest manufacturers and suppliers of institutional furniture for large-scale government and private sector contracts.

12. In 1990, the Company began engineering height-adjustable tables and desks and quickly became a leading voice in the advancement of workplace ergonomics. Known for flexibility and configurability, the Company's height adjustable product lines are designed to

work in virtually any type of office layout, from private offices to systems environments, to open plans.

13. In 2012, the Company launched a new brand, known as "JRB Studio." The brand captures and presents the sophistication and innovation that aligns with Company's history of providing some of the world's leading height-adjustable furniture products. Among other awards, JRB Studio was recognized in 2013 for its commitment to ergonomics and sustainability, when it received a Best of NeoCon Silver Award for the Newhouse Footrest. The Debtor's products are shown at its website at www.bakermanufacturing.com.

14. The Company operates its manufacturing and distribution business on immovable property (the "**Facility**")[2] that it leases from the Baker Family Partnership ("**Baker Partnership**"),[3] pursuant to an oral lease (the "**Facility Lease**"). Pursuant to the terms of the Facility Lease, the Debtor agreed to pay the Baker Partnership $17,172.00 a month. The Debtor has not paid rent on the Facility Lease since December 2017. As of the Petition Date, the Debtor owes Baker Partnership $394,956 in past due rent.

B. Corporate Structure

15. The following chart shows the Debtor's shareholders and their equity interests in the Debtor as of the Petition Date:

---

[2] As discussed later in this Declaration, Red River Bank holds a first-ranked Multiple Indebtedness Mortgage granted by the Baker Partnership to secure the Debtor's obligations to Red River Bank.

[3] The Baker Partnership is a Louisiana limited partnership owned as follows: James R. Baker, Jr., general partner; the Succession of Diana Lynn Baker, limited partner; and Sharon Baker Martin (in Trust), limited partner.

| NAME | EQUITY INTERESTS |
|---|---|
| James R. Baker, Jr. | 13.66% |
| Sharon Baker Martin (in Trust) | 13.66% |
| Succession of Diana Lynn Martin (in Trust) | 13.66% |
| Succession of Paul Matthews | 1.06% |
| Baker Family Partnership | 57.96% |
|  | 100.00% |

16. As of the Petition Date, the Debtor owes certain of its shareholders approximately $3.3 million, through a combination of the following (collectively, the "**Insider Unsecured Claim**"): (a) deferred compensation owed to certain of the holders of equity interests; and (b) principal and interest due on certain promissory notes, payable to the order of three holders of the Debtor's equity interests, with monthly payments deferred until May 2019. The Insider Unsecured Claim is subordinated to the secured claim of Red River Bank, as discussed below.

17. The following chart shows "insiders" of the Debtor, within the meaning of Bankruptcy Code section 101(31), and all compensation paid by the Debtor to that person or entity during the two (2) years before the Petition Date, as well as compensation paid (or to be paid) during this Chapter 11 Case:

| NAME | POSITIONS | COMPENSATION WITHIN 2 YEARS | CURRENT MONTHLY COMPENSATION |
|---|---|---|---|
| Charles E. Martin | Chief Executive Officer, President, and Director | $583,495.20[4] | $22,312.30 |
| James R. Baker, Jr. | Director and Shareholder | $156,000.00[5] | $-0- |
| Sharon Baker Martin (In Trust) | Shareholder | $-0- | $-0- |
| Estate of Paul Matthews | Shareholder | $-0- | $-0- |
| Baker Partnership | Shareholder | $-0- | $-0- |

**C.     Circumstances Leading to this Chapter 11 Case**

18.     Commercial furniture companies, like the Debtor, do not sell directly to consumers. Instead, businesses place orders for furniture through one of the manufacturer's dealers (the "**Dealers**"). Dealers either sell exclusively for one manufacturer, or sell for more than one manufacturer.

19.     In 2018, approximately 65% to 70% of commercial furniture in the United States was manufactured and sold by three companies (the "**Major Manufacturers**"), who each have an extensive network of Dealers across the United States. The Debtor competes, and sometimes works in tandem, with some of the Major Manufacturers. The Debtor also competes with other smaller manufacturers, as well as companies that import and sell foreign-made commercial business furniture.

20.     The Debtor's major challenge has been reaching potential commercial purchasers to make and finalize sales, because it does not have an exclusive Dealer network. As of the Petition Date, the Debtor had independent contractor relationships with approximately 54

---

[4] In an attempt to assist the Debtor, I deferred approximately $24,000 per year of my compensation. I am currently owed approximately $34,833.51 in deferred compensation.

[5] Mr. Baker has received no salary or dividends from 2017 through 2018 and is owed approximately $162,500.00 as of the Petition Date. In an attempt to assist the Debtor, Mr. Baker continues in his position as General Partner.

independent representatives, and employed five sales managers. The independent representatives are paid based on a sales' commission, while the sales managers receive a salary and incentives based on sales.

21. Although the Company faces these distribution challenges, the Company's product is well known for its excellent quality, its sophisticated and ergonomic designs, and its ability to manufacture and deliver "special orders" in an extraordinary abbreviated time period.

**D.     Red River Bank's Pre-Petition Loan**

22. The Debtor, as borrower, and Red River Bank, as lender ("**Red River Bank**"), are parties to (a) that certain Loan Agreement, dated as of September 13, 2002 (the "**Loan Agreement**"), and (b) that certain Security Agreement, also dated as of September 13, 2002 (the "**Security Agreement**").

23. To secure its obligations under the Loan Agreement (collectively, the "**Red River Bank Secured Obligations**"), in the Security Agreement, the Debtor expressly granted Red River Bank first priority security interests (collectively, the "**Red River Bank Personal Property Liens**") on all or substantially all of the Debtor's personal property, including, but not limited to, all of the Debtor's right, title and interest in and to all accounts due and owing from all customers, including but not limited to governmental customers, all contractual payments due by the United States Postal Service, all inventory, equipment, fixtures, accounts receivable, general intangibles, instruments, documents, chattel papers, deposit accounts and all other property of every kind or nature, whether any of the foregoing was owned then or acquired later; all accessions, additions, replacements, and substitutions related to any of the foregoing, all records of any kind relating to any of the foregoing; all proceed related to any of the foregoing

(including insurance, chattel paper and accounts proceeds) and all related general intangibles (collectively, the "**Red River Bank Personal Property Collateral**").

24. The Pre-Petition Personal Property Liens were perfected by that certain UCC-1 Financing Statement, filed in Rapides Parish, Louisiana, on September 13, 2002, at File No. 40-063449, together with the following continuation statements, each filed in Rapides Parish, Louisiana: (a) that certain continuation statement filed on May 21, 2007, at File No. 40-087308; (b) that certain continuation statement filed on March 25, 2012, at File No. 40-113409; and (c) that certain continuation statement filed on March 14, 2017, at File No. 40-145955.

25. To secure the Pre-Petition Secured Obligations, the Baker Partnership granted Red River Bank a first-ranked Multiple Indebtedness Mortgage that encumbers the Facility (the "**Facility Mortgage**"). The Facility Mortgage was recorded in Rapides Parish, Louisiana, on September 17, 2003, at Book No. 1935, Page 110, and was reinscribed on May 5, 2013, at Book No. 2754, Page 0819.

26. To further secure the Pre-Petition Secured Obligations, the Debtor granted Red River Bank a first-ranked Multiple Indebtedness Mortgage that encumbers 2.87 acres adjacent to the Facility (the "**Adjacent Property Mortgage**"). The Adjacent Property Mortgage was recorded in Rapides Parish, Louisiana, on September 17, 2003, at Book No. 1935, Page 93, and was reinscribed on May 7, 2013, at Book No. 2736, Page 137.

27. James R. Baker, Jr., Sharon Martin Baker, the Succession of Diana Lynn Baker, and the Baker Family Limited Partnership II each executed continuing guaranties of the Red River Bank Secured Obligations.

28. The Debtor has not filed a motion for authority to use any of its (a) pre-petition cash, (b) receivables generated before the Petition Date, or (c) the proceeds of the foregoing

(collectively, he "**Red River Bank Cash Collateral**").  Instead, the Debtor intends to segregate the Red River Bank Cash Collateral and hold the same pending further Order of this Court.

29.    Because the Debtor will not use the Red River Bank Cash Collateral, the Debtor has filed a DIP Motion (as discussed below) to fund its operations pending the approval of the Sale Transaction.

30.    Shortly before the Petition Date, in order to obtain additional advances of funds to pay the Company's immediate operating obligations, including payroll, the Debtor executed the certain Assignments of Life Insurance Policies as Collateral (the "**Assignments**").  The Assignments related to the following life insurance policies (the "**Life Insurance Policies**") issued by The Lincoln National Life Insurance Company ("**Lincoln**"):  (a) that certain universal life policy, base coverage $50,000, with a net cash surrender value as of April 30, 2018, of $131,663.45, Alfred D. Muse, the insured; and (b) that certain universal life policy, base coverage $50,000, with a net cash surrender value as of April 30, 2018, of $121,103.64, Richard B. Swain Sr., the insured.  Before the Petition Date, the Debtor submitted applications to Lincoln to claim the net cash surrender value of the Life Insurance Policies.  Based on Red River Bank's Assignments, the Debtor intends to permit Lincoln to pay the net cash surrender value to Red River Bank.

31.    As of the Petition Date, the following amounts are owed Red River Bank on and with respect to the Red River Bank Pre-Petition Secured Obligations:  (a) approximately $4,290,225.00 in principal, and (b) less than $2,000.00 in accrued, unpaid interest.

## PART III.
## FIRST DAY MOTIONS

32.    Concurrently with the filing of the voluntary petition to commence this Chapter 11 Case, the Debtor has filed a number of First Day Motions. The Debtor anticipates the Court

{N3661262.4}                                                    9

18-81104 - #17  File 11/05/18  Enter 11/05/18 14:38:37  Main Document  Pg 9 of 20

will conduct a hearing within a business day or two after commencement of the Chapter 11 Case (the "**First Day Hearing**"), during which the Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

33. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of this Chapter 11 Case; and (b) continuing the Debtor's operations during this Chapter 11 Case with as little disruption as possible pending the Sale Transaction. I have reviewed the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success through this Chapter 11 Case.

34. The following is a discussion of the First Day Motions that the Debtor will ask the Court to consider at the First Day Hearing.

A. *Debtor's Emergency Motion for Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 364, Fed R. Bankr. P. Rule 4001(c), Authorizing the Debtor to Obtain DIP Financing; (II) Granting Related Relief, and (III) Scheduling a Final Hearing* (the "**DIP Motion**") (Docket No. 5)

35. On the Petition Date, the Debtor filed the DIP Motion, seeking an order (i) authorizing an interim order (the "**Interim DIP Order**") and a final order (the "**Final DIP Order**") authorizing the Debtor to obtain DIP financing (the "**DIP Loan**") from BSPE1, LLC (the "**DIP Lender**").[6] The DIP Loan will be (a) secured by (i) a junior lien on property of the estate that is subject to a lien as of the Petition Date, and (i) a first-ranked lien on any property of

---

[6] As disclosed in the DIP Motion, the DIP Lender is a Louisiana limited liability company, owned by Sharon Baker Martin and James R. Baker, Jr., each of whom (a) is a shareholder of the Debtor, and (b) executed guaranties of the Red River Bank Secured Obligations. The DIP Lender is represented in this Chapter 11 Case by H. Kent Aguillard.

the estate that is unencumbered as of the Petition Date, and (b) made on a superpriority administrative claim basis.

36. As previously discussed, the Debtor has not filed a motion for authority to use the Red River Bank Cash Collateral. As a consequence, the Debtor will segregate the Red River Bank Cash Collateral and hold the same pending further Order of this Court. Without the use of the Red River Bank Cash Collateral, the Debtor will need a loan to fund certain costs of administering the Debtor's estate, including without limitation, payroll obligations, other operating expenses, fees assessed by the Office of the United States Trustee and the Clerk of Court, and the fees and expenses of the estate's professionals. Therefore, the Debtor filed the DIP Motion, seeking approval of the loan agreement substantially in the form of Exhibit 2 to the DIP Motion (the "**DIP Loan Agreement**").

37. I believe that the terms of the DIP Loan Agreement are fair and reasonable under the circumstances. For example, the Debtor does not propose, among other things, granting the DIP Lender: (a) any lien that would outrank valid liens that exist on the Petition Date; (b) any lien on avoidance actions under chapter 5 of the Bankruptcy Code; or (c) the right to any automatic termination of the stay under Bankruptcy Code section 362. The specific terms of the DIP Loan Agreement are summarized in the DIP Motion.

38. As previously discussed, all or substantially all of the Debtor's assets are encumbered by the Red River Bank Personal Property Liens, including, but not limited to, the Red River Bank Cash Collateral. The Debtor has been unable to negotiate an agreement with Red River Bank to use its cash and receivables during the Chapter 11 Case.

39. Under these circumstances, based on my experience, stand-alone postpetition financing on an unsecured basis during the Chapter 11 Case would be virtually impossible to

obtain. It is highly unlikely that a lender would make a loan for which no debt service payments can be made during the Chapter 11 Case unless there is other considerations for the making of such a loan. Therefore, I believe that the Debtor cannot obtain financing on terms more favorable than the DIP Loan Agreement.

40. I also believe that the Debtor's decision to enter into the DIP Loan Agreement represents a reasonable exercise of its business judgment.

**B.** *Motion for Entry of an Order to (A) Pay All Outstanding Pre-Petition Wages, Salaries, Other Accrued Compensation, Expense Reimbursements, Benefits, and Related Amounts; and (B) Continue Specified Benefit Programs in the Ordinary Course of Business* (the "**Wage and Benefit Motion**") (Docket No. 8)

41. On the Petition Date, the Debtor filed the Wage and Benefit Motion, as part of the Debtor's effort to enable to the Debtor to maintain morale during this critical time, retain its key employees and minimize the personal hardship such employees may suffer if pre-petition employee obligations (the "**Employee Obligations**") are not paid when due or honored as expected, the Debtors seek an order of this Court authorizing, but not directing the Debtors to pay and honor all Employee Obligations and authorizing all banks to honor the Debtor's pre-petition checks or electronic transfers fir payment of the Employee Obligations. Additionally, the Debtor seeks an order authorizing all banks to receive, process, honor, and pay any and all checks or electronic transfers drawn on the Debtor's payroll related to ordinary course Employee Obligations, whether presented before or after the Petition Date, provided sufficient funds are on deposit in the applicable Bank Account (as defined herein) to cover such payments.

**C.** *Motion for the Entry Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "**Utilities Motion**") (Docket No. 7)

42. In connection with the operation of its business and the management of its estate, the Debtor obtains certain utility services (the "**Utility Services**") from various utility companies (the "**Utility Companies**"). In the ordinary course of business, the Debtor regularly incurs utility expenses for the Utilities Services provided by its Utility Providers.[7]

43. The Debtor filed the Utilities Motion on the Petition Date because uninterrupted Utility Services are essential to the preservation of the Debtor's estate and assets, and therefore, to the success of this Chapter 11 Case. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's ability to preserve and maximize the value of its estate could be severely and irreparably harmed.

44. The Debtor has established a good payment history with virtually all of its Utility Companies, consistently making payments on a regular and timely basis. To the best of the Debtor's knowledge, there are no defaults or arrearages of any significance with respect to the Debtor's undisputed Utility Services invoices, other than the payment interruptions that may result from the commencement of this Chapter 11 Case. The Debtor intends to pay its post-petition obligations to the Utility Companies in a timely manner. The Debtor further intends to provide its Utility Companies with the adequate assurance, as set out in the Utilities Motion.

**D.** *Motion for Entry of an Order Authorizing the Debtor to Pay Certain Pre-Petition Taxes and Fees and (B) Directing Banks to Honor Payments Relating to Same* **(THE "Tax Motion") (Docket No. 10).**

45. On the Petition Date, the Debtor filed the Tax Motion, seeking authority to pay, in its sole discretion, undisputed pre-petition trust fund taxes and obligations (the "**Taxes**") owed to the state and local taxing authorities (the "**Taxing Authorities**"), in the ordinary course of

---

[7] A list of the Debtor's Utility Companies is attached to the Utility Motion as Exhibit A.

business. The Debtor has sufficient cash reserves and will have sufficient cash from ongoing operations to pay the amounts due in the ordinary course of business.

46. The failure to pay the Taxes could disrupt the Debtor's business. In connection with the normal operation of its business, the Debtor collects, among other things, sales taxes from its customers and other third parties for remittance to the Taxing Authorities. In addition, the Debtor accrues and incurs state use taxes. The Debtor estimates that, as of the Petition Date, it holds approximately $170,739.00 prepetition taxes, fees, and any related obligations, regardless of when incurred.[8]

47. If any Taxes are not paid by the Debtor, then the Debtor's members may be subject to lawsuits or criminal prosecution during the pendency of this Chapter 11 Case. Any such lawsuit or criminal prosecution (and the attendant potential liability) would undoubtedly distract the Debtor and its members from this Chapter 11 Case to the detriment of all parties-in-interest. The amount requested herein is nominal compared to the Debtor's total pre-petition debt.

48. The Debtor also requests an order authorizing Red River Bank, when requested by the Debtor, in its sole discretion, to process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtor's account to pay all pre-petition obligations described herein, whether such checks or other requests were submitted prior to or after the Petition Date. The Debtor further requests the Bank be authorized to rely solely on the Debtor's designation of any particular check or electronic payment.

E. ***Motion for an Order (A) Establishing a Bar Date for Filing Proofs of Claim, (B) Approving the Bar Date Notice, and (C) Approving Mailing Procedures* (the "Bar Date Motion") (Docket No. 12)**

---

[8] A breakdown of taxes owed is attached to the Tax Motion as **Exhibit B**.

{N3661262.4}  14

49. On the Petition Date, the Debtor filed the **Bar Date Motion,** in order to obtain complete and accurate information regarding the nature, amount, and status of all claims ("**Claims**")[9] against the Debtor that will be asserted in this Chapter 11 Case. Accordingly, the Debtor seeks entry of an order (the "**Bar Date Order**") (attached to the Bar Date Motion as Exhibit A) (a) fixing 5:00 p.m. (Central Standard Time) on **December 17, 2018,** as the bar date by which proofs of claim against the Debtor must be filed (the "**Bar Date**"), (b) approving the Debtor's proposed notice of the Bar Date (the "**Bar Date Notice**") (attached to the Bar Date Motion as Exhibit B), and (c) approving the mailing procedures.

F. *Motion for Authority to Approve Compensation & Payments to Insider* **(the "Insider Compensation Motion") (Docket No. 9)**

50. On the Petition Date, the Debtor filed the Insider Compensation Motion in order to pay me, as the Debtor's Chief Executive Officer and President.

51. Mr. Baker, as the General Partner of the Debtor, is an insider. Mr. Baker's annual compensation for the last two years from the Debtor has been approximately $78,000 a year. Mr. Baker has received no salary or dividends from 2017 through 2018 and is owed approximately $162,500.00. In an attempt to assist the Debtor, Mr. Baker continues in his position as General Partner. The Debtor is not seeking authority to make any payments to Mr. Baker at this time.

52. As the Chief Executive Officer and President, it is my understanding that I am an insider as defined in the Bankruptcy Code. 11 U.S.C. § 101(31). My annual compensation within the last two years from the Debtor has been approximately $291,747.60 a year. I did not receive any dividends from 2017 through 2018. In an attempt to assist the Debtor, I have deferred approximately $24,000 per year of my compensation. I am currently owed approximately $34,833.51 in deferred compensation. At the time of the Petition Date, my salary was set at

---

[9] The term "Claim," as used herein, has the meaning ascribed to it in 11 U.S.C. § 101(5).

$291,747.60. Post-petition, I am requesting that I continue to defer $24,000 of my annual compensation (reducing my annual compensation to $267,747.60) and only receive the remainder of my salary on a bi-monthly basis in the gross amount of $11,156.15 per pay period.

53. Particularly, in the light of the significant decrease in salary, the relief sought through the Insider Payment Motion is reasonable and necessary for the Debtor's successful progression through the chapter 11 process.

G. *Motion for an Order Limiting Notice & Establishing Notice Procedures* (the "**Motion to Limit Notice**") (Docket No. 6)

54. On the Petition Date, the Debtor filed its Motion to Limit Notice. The Debtor seeks entry of an order limiting notice to certain creditors and parties-in-interest as well as to establish certain notice procedures. The Debtor also respectfully requests approval of the "**Special Service List**," as defined in the Motion to Limit Notice, and approval to update and amend the Special Service List from time to time and to add parties requesting notice without further motion or order form this Court. The Special Service List is requested in this Motion to provide necessary creditors and other interested parties with adequate opportunity to object as required by the Bankruptcy Code and Bankruptcy Rules. Specifically, the Motion to Limit Notice provides notice will be given to (a) the Office of the United States Trustee for the Western District of Louisiana; (b) the Debtor and its counsel (including each of the Debtor's shareholders); (c) Red River Bank and its counsel; (d) all other secured creditors of the Debtor; (e) the Debtor's largest twenty (20) unsecured creditors; and (f) any governmental agencies having a regulatory or statutory interest in this Chapter 11 Case.

55. Furthermore, the relief sought through the Motion to Limit Notice does not contravene the Bankruptcy Rules in that the Special Service List will not apply to: (a) notice of the first meeting of creditors pursuant to Bankruptcy Code section 341; (b) notice of the time

fixed for filing proofs of claim; (c) notice of the hearing to consider approval of the disclosure statement and confirmation of a plan; (d) notice of the times fixed for filing objections to the disclosure statement and plan; (e) notice of the times fixed to submit ballots for accepting or rejecting the plan; (f) notice of any hearing on dismissal or conversion of this Chapter 11 Case; and (g) notice of any proposed Sale Transaction involving all or substantially all of the Debtor's assets.[10]

### H. *Application to Retain Jones Walker LLP as Debtor's Counsel ("Application to Retain Jones Walker")*(Docket No. 13 )

56. The Debtor has filed an *Application for Order Authorizing the Employment of Jones Walker LLP as Counsel to the Debtor,* Nunc Pro Tunc*, to the Petition Date, Pursuant to Section 327(e) of the Bankruptcy Code* (Docket No. 13).

57. The Application to Retain Jones Walker seeks interim and final approval, pursuant to section 327(a) of the Bankruptcy Code, to employ and retain Jones Walker LLP ("**Jones Walker**") as its counsel in connection with the commencement and prosecution of this Chapter 11 Case. Pursuant to sections 328(a), 330, and 331 of the Bankruptcy Code, the Debtor, as a debtor-in-possession, requests that the Court approve the retention and compensation of Jones Walker as its attorneys to perform the legal services that will be necessary during the Chapter 11 Cases.

58. The Debtor selected Jones Walker as its attorneys because of the firm's knowledge of the Debtor's business and financial affairs and Jones Walker's experience in the field of bankruptcy and business reorganizations under Chapter 11 of the Bankruptcy Code.

---

[10] *See also* Section 6 of the local Administrative Procedures for the United States Bankruptcy Court for the Western District of Louisiana.

Jones Walker has represented debtors, various committees, and other parties-in-interest, and is qualified to act as attorneys for the Debtor.

59. The services of Jones Walker under a general retainer are appropriate and necessary to enable the Debtor to execute its duties as a debtor and a debtor-in-possession faithfully and to implement the restructuring and reorganization of the Debtor.

I. *Motion For Administrative Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures tor Interim Compensation and Reimbursement of Expenses ("Interim Compensation Procedures Motion")* **(Docket No. 14)**

60. The Debtor filed an Interim Compensation Procedures Motion to assist in streamlining the compensation procedures.

61. The Debtor has filed the Application to retain Jones Walker as bankruptcy counsel for the Debtor and anticipates that it will also seek authority to retain other professionals as the need arises during the Chapter 11 Case (collectively, the "**Professionals**").

62. The Debtor, through the Interim Compensation Procedures Motion, requests that procedures for compensating and reimbursing court-approved Professionals on a monthly basis be established.

63. The Debtor submits that the efficient administration of this Chapter 11 Case will be significantly aided by establishing the foregoing interim compensation and expense reimbursement procedures. Such an order will permit the Court and all other parties to more effectively monitor the Professional fees incurred in this Chapter 11 Case.

## PART IV.

### MOTIONS AND APPLICATIONS TO BE HEARD
### AFTER THE FIRST DAY HEARINGS

64. The Debtor anticipates seeking the entry of certain additional orders to assist it in the orderly conduct of this Chapter 11 Case at a hearing to be held after the First Day Hearing. These orders will be vital to the smooth transition into chapter 11 and through a successful reorganization. The Debtor intends to file an *Application for Order Authorizing the Employment of Legacy Capital, LLC as Investment Banker to the Debtor,* Nunc Pro Tunc, *to the Petition Date*. The Investment Banker's services are necessary in order to maximize the proceeds generated from the proposed sale transaction.

## CONCLUSION

65. For the reasons described herein and the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of the estate and its creditors, as well as any other parties-in-interest, will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## DECLARATION

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: November 5, 2018.

/s/ *Charles E. Martin*
Charles E. Martin
CEO & President
Brekac Manufacturing Company, Inc.